| Clairvil v Vemulapalli |
|:---:|
| 2023 NY Slip Op 34550(U) |
| December 28, 2023 |
| Supreme Court, Kings County |
| Docket Number: Index No. 510815/2021 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 80 of the Supreme
Court of the State of New York, held in and
for the County of Kings, at the Courthouse, at
360 Adams Street, Brooklyn, New York, on
the 28th day of December 2023.

PRESENT:

HON. GENINE D. EDWARDS
                            Justice.
------------------------------------------------------------------------X
LORMISHA CLAIRVIL, as Administrator of the
Estate of MIRLANDE CLAIRVIL,

                            Plaintiff,
            -against-                                            Index No.: 510815/2021
                                                                Decision and Order

PRATIBHA VEMULAPALLI, M.D., CESAR
AYALA-RODRIGUEZ, M.D., VISHAL DHULIPALA,
M.D. and THE BROOKLYN HOSPITAL CENTER,

                            Defendants.
------------------------------------------------------------------------X

The following e-filed papers read herein:                      NYSEF Nos.:

Notices of Motion, Affirmations and Exhibits..................51-70; 71-90; 93-114
Opposing Affirmations and Exhibits............................120-123; 124-127; 128-131
Affirmations in Reply........................................133, 134, 136

In this action to recover damages for medical malpractice, negligence, and failure

to obtain informed consent, defendants PRATIBHA VEMULAPALLI, M.D., VISHAL

DHULIPALA, M.D. and CESAR AYALA-RODRIGUEZ, M.D. with THE BROOKLYN

HOSPITAL CENTER moved separately for summary judgment to dismiss the complaint

pursuant to CPLR 3212. Plaintiff opposed the motions.

FACTS

The decedent, Mirlande Clairvil, was a 55-year-old morbidly obese female who

initially presented to Brooklyn Hospital Medical Center ("Brooklyn Hospital") on

October 3, 2019, for consultation and treatment for her obesity. She was seen by Dr.

[* 1]

Melanie Howell. As per Dr. Howell's note, she had been morbidly obese for more than five years, had tried multiple diets, and had several months of physician/dietician guidance, but was unable to stay at a healthy weight. She came in to consider bariatric surgery. Her medical history, in addition to obesity, was also significant for joint pain and uterine fibroids. Dr. Howell's examination of the decedent's extremities revealed full range of motion, no edema, cyanosis or clubbing, and musculoskeletal examination revealed 5/5 (full) strength, normal range of motion and no swollen or erythematous joints. Following this assessment, Dr. Howell diagnosed the decedent with Class III severe obesity (based upon BMI) with serious comorbidities and noted that the decedent satisfied the NIH Consensus guidelines criteria for surgical treatment of severe obesity. Dr. Howell further documented that the decedent was aware that there were non-surgical methods to achieve weight loss, however, surgery was medically indicated. During their discussion, the decedent expressed her interest in sleeve gastrectomy. Dr. Howell averred that she discussed the risks, benefits and alternatives associated with the proposed bariatric surgical procedure, including risk of blood clots; leak of stomach, intestinal or esophageal fluids; bleeding; infection; hernia; bowel obstruction; scar tissue; ulcer; stricture; vitamin, nutrient, protein deficiency; nerve and skin problems; spleen injury or splenectomy; GERD; myocardial infarction; stroke; death; the need for conversion to an open long incision; and the need for a reoperation. Dr. Howell documented that the decedent demonstrated her understanding that there were other risks, and this was not a full list but nonetheless wished to proceed and executed the consent form. Dr. Howell further documented that she counseled the decedent on the fact that it was her responsibility to make follow-up appointments with Dr. Howell, a bariatric dietician, her primary care physician, and a mental health professional, if needed.

On November 5, 2019, the decedent submitted to a nutritional consultation with Lenore Caliolio, R.D. to prep for surgery, including recommendation for diet, light to moderate exercise and monthly attendance at a nutritional education group.

On November 21, 2019, Ms. Clairvil underwent a cardiology consultation by defendant Dr. Cesar Ayala-Rodriguez, at Brooklyn Hospital, for preoperative clearance

[* 2]

for bariatric surgery, which was planned for January or February 2020. He noted Ms. Clarivil's sedentary lifestyle and recommended that she increase her aerobic activity. She had limited exercise tolerance, with some ankle pain, but no chest pain or significant dyspnea on exertion. Dr. Ayala-Rodriguez ordered an EKG (electrocardiogram), TTE (transthoracic echocardiogram), and EST (cardiac stress test). While she had no noted past hypertension, she was hypertensive during the visit. He started her on Amlodipine for hypertension.

On February 20, 2020, Ms. Clairvil followed up with Dr. Ayala-Rodriguez. She was feeling better since starting Amlodipine. A physical exam revealed no clubbing, cyanosis, edema nor swelling in her joints. She moved her extremities spontaneously and had a normal gait. The EKG revealed sinus bradycardia (slow heart rate) but was otherwise normal. The TTE as well as other testing were normal.

Due to the COVID-19 pandemic, the surgery was postponed. Ms. Clairvil's initial visit with the surgeon, Dr. Pratibha Vemulapalli, was on May 21, 2020. Dr. Vemulapalli, indicated that she completed a preoperative workup including a psychological evaluation and clearance by her primary care physician. Surgical options were discussed. On that date, she had no shortness of breath, chest pain, or heart palpitations. Her extremities revealed a full range of motion, no edema, cyanosis, or clubbing. She had 5/5 strength and no swelling or erythema in her joints. She made no complaints of any leg pain. Dr. Vemulapalli's notes indicated that surgery was discussed as well as the risks of that surgery, including the known risk of blood clots.

Approximately eight months after Ms. Clairvil's initial evaluation for the surgery, on June 29, 2020, Ms. Clairvil, presented to Brooklyn Hospital for COVID-19 testing and a pre-operative evaluation. She was seen by Nurse Zhong Wang. Nurse Wang reported that Ms. Clairvil was a 56-year-old female with morbid obesity who presented for COVID-19 screening and was planning for laparoscopic sleeve gastrectomy on July 1, 2020. Nurse Wang conducted a physical examination, just two days before the planned procedure. Nurse Wang's physical examination was positive for left lower leg pain and edema of her bilateral lower extremities. This was the first notation of lower leg pain of

[* 3]

this nature and the first notation of lower extremity swelling. While Ms. Clairvil had previous complaints of ankle joint pain, Nurse Wang specifically noted that her joints on that day were grossly normal. At her deposition, Nurse Wang admitted never reporting the complaints of leg pain or edema to Dr. Dhulipala, Dr. Ayala-Rodriguez, or Dr. Vemulapalli. It was Nurse Wang's expectation that those doctors would read her note prior to surgery. Ms. Clairvil underwent a preoperative venous thromboembolism risk assessment, which confirmed a score of 2, indicating a moderate/high risk of venous thromboembolism. Dr. Vemulapalli ordered sequential compression devices.

On July 1, 2020, just two days later, Ms. Clairvil returned to Brooklyn Hospital for the laparoscopic sleeve gastrectomy, which was performed by Dr. Vemulapalli. He did not follow up on Nurse Wang's findings of lower extremity pain and swelling during the visit on June 29, 2020. Dr. Vemulapalli concurred that DVT would be in the differential diagnosis of a morbidly obese patient, awaiting bariatric surgery, and who presents with pain of the left lower leg and 2 plus edema bilaterally in the lower extremities. Dr. Vemulapalli testified that DVT can go to the lung in the form of a pulmonary embolism and that "generally, that's why we worry about DVT." He stated that Nurse Wang didn't advise him of the positive findings from two days before, however, admitted that he read Nurse Wang's note prior to surgery. Ms. Clairvil was given 5,000 units of Heparin intraoperatively. The procedure was performed without incident.

In the recovery room, Ms. Clairvil was noted as having an irregular rhythm on the cardiac monitor. She was seen by Dr. Vemulapalli and was given an EKG and Lopressor. A regular sinus rhythm returned. On the evening of July 2, 2021, Ms. Clairvil was seen by Dr. Ayala-Rodriguez. She was noted as having postoperative atrial fibrillation. An EKG revealed normal sinus rhythm. Dr. Ayala-Rodriguez documented that Ms. Clairvil was hemodynamically stable and that her heart rate was well controlled. Dr. Ayala-Rodriguez indicated that she could be discharged on anticoagulants when deemed fit from a surgical standpoint and that she should undergo further cardiology follow-up in the coming week.

Ms. Clairvil was discharged from Brooklyn Hospital on July 3, 2020.

Post-discharge, Ms. Clairvil was seen by Dr. Dhulipala (of the Brooklyn Hospital Cardiology Clinic), on July 16, 2020. According to his notes, she did not report any complaints of chest pain, cough, rapid heartbeat, leg pain or swelling, nor were such findings observed on physical examination. He noted that Ms. Clarivil had been home since the surgery and that the most (or only time) she walked since the surgery was the day of the visit. Ms. Clairvil complained of dizziness, excess burping, poor oral intake, and nausea in the past two weeks postoperatively. Dr. Dhulipala noted shortness of breath on exertion; that she had reduced exercise tolerance, as before the surgery she could walk three blocks but now could only walk half a block. He related this to deconditioning post-surgery.

On July 23, 2020, Ms. Clarivil called Dr. Vemulapalli's office and spoke with the surgical coordinator complaining of nausea. The surgical coordinator texted Dr. Vemulapalli to inquire whether Ms. Clarivil should come in. Dr. Vemulapalli replied that she should go to the emergency room. Ms. Clarivil apparently responded that she did not want to go to the emergency room. Dr. Vemulapalli then contacted her by phone and convinced her to go to the emergency room because he was concerned about Ms. Clairvil's nausea and lack of adequate intake of fluids, as she had reportedly only consumed 30 ounces of fluid on that date. Dr. Vemulapalli attributed her nausea and lack of adequate fluid intake to normal postoperative nausea and decreased tolerance for the protein shakes that patients were advised to drink following bariatric surgery.

On July 24, 2020, Dr. Vemulapalli called one of her residents to inquire whether Ms. Clairvil had presented to the emergency room, and she learned that Ms. Claivil had not. She then instructed her surgical coordinator to reach out to Ms. Clairvil, who told the surgical coordinator that she was feeling better and drinking. A follow-up appointment was made for July 27, 2020.

On July 27, 2020, EMS was contacted by a family member, who indicated that Ms. Clairvil complained of knee pain after taking a shower and began sliding downwards into a seated position and was non-responsive. Upon arrival, EMS found Ms. Clairvil lying supine on the floor in the hallway, unresponsive and without a pulse. Examination

[* 5]

by paramedics revealed lung sounds diminished equal bilaterally with absent pulse whereupon ACLS protocol was initiated, and Ms. Clairvil was intubated, however, they were unable to obtain IV access due to poor vasculature. Resuscitative efforts continued in the field and in the emergency room at Brookdale Hospital. Ms. Clairvil remained in asystole and PEA arrest (pulseless electrical activity) and no shockable rhythm was ever obtained. She was pronounced dead after twenty minutes of ACLS protocol.

On July 30, 2020, an autopsy, arranged privately by the family, was performed by Dr. Zhongxue Hua. Dr. Hua findings included pulmonary emboli within the bilateral main pulmonary arteries and bilateral legs with visible deep vein thrombosis. Dr. Hua noted that significant risk factors for pulmonary emboli from the deep leg vein thrombosis included recent gastric bypass surgery with limited mobility, without effective treatment and/or prophylaxis for deep leg vein thrombosis during the last two weeks of her life, and without prophylactic filter within the inferior vena cava.

## LAW

The elements of a medical malpractice action are a deviation or departure from accepted practice and evidence that such departure was a proximate cause of injury or damage. A defendant's negligence is the proximate cause when it is a substantial factor in the events that produced the injury. *Templeton v. Papathomas,* 208 A.D.3d 1268, 175 N.Y.S.3d 544 (2d Dept. 2022). "When moving for summary judgment, a defendant... must establish the absence of any departure from good and accepted medical practice or that... plaintiff was not injured thereby." *Barnaman v. Bishop Hucles Episcopal Nursing Home,* 213 A.D.3d 896, 184 N.Y.S.3d 800 (2d Dept. 2023). To sustain the burden, a defendant "must address and rebut any specific allegations of malpractice set forth in plaintiff's bill of particulars." *Mackauer v. Parikh,* 148 A.D.3d 873, 49 N.Y.S.3d 488 (2d Dept. 2017).

In opposition, the plaintiff must "raise a triable issue of fact regarding the element or elements on which defendant has made its prima facie showing." *Aliosha v. Ostad,* 153 A.D.3d 591, 61 N.Y.S.3d 55 (2d Dept. 2017). To do so, plaintiff must submit the

[* 6]

affidavit of "a[n expert] physician attesting to a departure from good and accepted practice, and stating the physician's opinion that the alleged departure was a competent producing cause of plaintiff's injuries." *Kielb v. Bascara*, 217 A.D.3d 756, 191 N.Y.S.3d 158 (2d Dept. 2023).

<u>ANALYSIS</u>

Plaintiff contended that each of the defendants who saw Ms. Clairvil, both before and after her laparoscopic sleeve gastrectomy, failed to recognize symptoms that indicated that she was at risk for a deep vein thrombosis ("DVT"), a well-known possible outcome of the surgery. Plaintiff averred, among other contentions, that the failure to have tested her for DVT before and after the surgery caused her death from a DVT. Plaintiff further argued that in the consent form signed by Ms. Clairvil, the risk of blood clots was part of the pre-printed form and not hand-written, and that the enhanced risks of proceeding to surgery after being relatively sedentary during the pandemic were not explained.

The defendants asserted that plaintiff's allegations are misplaced as additional diagnostic tests to rule out DVT were not indicated in the absence of appropriate clinical findings. According to the defendants' experts, findings warranting imaging studies and other diagnostic tests to rule out a DVT include new unilateral swelling or pain in the lower extremity (meaning in the calf, thigh or behind the knee). Defendants argued that generally, bilateral swelling of the lower extremities is not associated with a unilateral DVT. In the present case, there was no clinical suspicion of venous thromboembolism (DVT or pulmonary embolism) pre-operatively for the following reasons: (i) the records indicated that Ms. Clairvil had a history of arthritic joint pain as well as lower extremity edema; (ii) Ms. Clairvil's multiple assessments, from her initial bariatric surgical evaluation by Dr. Howell, on October 3, 2019 through her preoperative physical examination performed by Dr. Vemulapalli, on July 1, 2020, did not reveal any documented complaints of new onset lower extremity pain; (iii) the only documented complaints of lower extremity pain during this timeframe were Ms. Clairvil's complaints

[* 7]

of dyspnea on exertion due to arthritic ankle pain as documented in the records from cardiologist Dr. Ayala-Rodriguez and the June 29, 2020 COVID testing and exam by Nurse Wang; (iv) Ms. Clairvil did not report any complaints of lower extremity pain during her visits with Dr. Vemulapalli; (v) there was no documentation of any findings of lower extremity swelling or edema observed by any of the multiple providers who evaluated Ms. Clairvil between Dr. Howell's assessment of October 3, 2019 through Dr. Vemulapalli's preoperative assessment on the date of surgery, July 1, 2020, with the exception of the assessment by Nurse Wang on June 29, 2020; (vi) that physicians, particularly cardiologists, have superior skills in the observation of lower extremity edema, particularly in the obese population where large lower extremities due to a patient's obesity can be perceived as swelling; (viii) whether or not Dr. Vemulapalli was aware of Nurse Wang's findings of edema in Ms. Clairvil's bilateral lower extremities is irrelevant to her management of Ms. Clairvil, since ultimately this observation as well as any reported complaints of lower extremity pain, was not observed by Dr. Vemulapalli during her two encounters with Ms. Clairvil preoperatively (or by her colleagues who evaluated Ms. Clairvil between October 3, 2019 and July 1, 2020); (ix) Nurse Wang's findings of lower extremity edema, if accurate, were related to Ms. Clairvil's history of arthritic lower extremity pain and edema as documented in the records from her primary care physician; (x) the complaints reported by Ms. Clairvil to Dr. Vemulapalli as well as his findings on physical examination, in addition to those obtained by Dr. Howell and Dr. Ayala-Rodriguez pre-operatively should not have raised Dr. Vemulapalli's index of suspicion of DVT warranting further investigation in this regard.

Dr. Vemulapalli further contended that postoperatively, there was likewise no evidence or clinical suspicion of DVT or pulmonary embolism during the time Ms. Clairvil was followed during her admission to Brooklyn Hospital following the surgery and all subsequent follow-ups. Instead, Ms. Clairvil's reported complaints to Dr. Vemulapalli following her discharge were limited to nausea and decreased oral and fluid intake, none of which is suggestive of DVT or pulmonary embolism.

The defendants met their prima facie burden through the affirmations of their medical experts, who opined that there were no departures from the applicable standard of care; that the risks and alternatives to the procedure were fully discussed with Ms. Clairvil; and that none of the care provided by the defendants caused or contributed to Ms. Clairvil's injuries. *Barnaman v. Bishop Hucles Episcopal Nursing Home*, 213 A.D.3d 896, 184 N.Y.S.3d 800 (2d Dept. 2023*); Cox v. Herzog*, 192 A.D.3d 757, 759, 139 N.Y.S.3d 881, 882 (2d Dept. 2021); *Lowe v. Japal*, 170 A.D.3d 701, 703, 95 N.Y.S.3d 363 (2d Dept. 2019).

In opposition, the affirmation of the plaintiff's expert, triple board certified in hematology, internal medicine, and medical oncology, who specializes in treating patients with both bleeding and clotting disorders, opined that defendants departed from good and accepted standards of medical practice in failing to properly investigate for deep vein thrombosis ("DVT") preoperatively, given Ms. Clairvil's presentation and history; in failing to diagnose DVT preoperatively; in failing to place Ms. Clarivil on therapeutic doses of Enoxaparin (low-molecular weight heparin or Lovenox) in the face of the DVT preoperatively; in failing to postpone the surgery and operating on a patient who had an active DVT; in prescribing Enoxaparin as a prophylaxis for DVT postoperatively for an insufficient duration; in failing to investigate for DVT postoperatively based on Ms. Clairvil's postoperative signs and symptoms; in failing to diagnose DVT postoperatively; and in failing to provide adequate information about the risks involved. The expert further opined that these departures were substantial factors in causing Ms. Clairvil's fatal pulmonary embolism. A timely investigation, diagnosis, and treatment of her DVT both pre and postoperatively with appropriate anticoagulant therapy would have more likely than not avoided her fatal occlusive pulmonary emboli from deep vein thrombosis.

Plaintiff proffered Dr. Dhulipala's deposition testimony, wherein he admitted that when he saw Ms. Clairvil, on July 16, 2020, she had numerous risk factors for clotting, including, surgery, postoperative atrial fibrillation, obesity, and a sedentary lifestyle. Dr. Dhulipala admitted that blood clotting was included in his differential diagnosis, although

[* 9]

he claims it was ruled out by her history and his physical examination. He admitted that no tests were done to rule out DVT, including the gold standard of a Doppler ultrasound. He also admitted that the only way to definitively rule out a clot is with imaging, such as a Doppler. Indeed, plaintiff's expert opined that Ms. Clairvil's known risk factors indicated the need to rule out the possibility of DVT, which each of the defendants had the opportunity to do, but none of them took that necessary precaution.

Plaintiff thereby raised triable issues of fact, *inter alia*, whether the defendants failed to diagnose DVT. *Pezulich v. Grecco*, 206 A.D.3d 827, 830–31, 169 N.Y.S.3d 680, 684 (2d Dept. 2022). Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. *Cerrone v. North Shore-Long Is. Jewish Health Sys., Inc.*, 197 A.D.3d 449, 152 N.Y.S.3d 147 (2d Dept. 2021) *Russell v. Garafalo*, 189 A.D.3d at 1102, 136 N.Y.S.3d 317 (2d Dept. 2020).

Although plaintiff raised issues of fact as to the negligence and malpractice of each of the defendants (see *Stewart v. N. Shore Univ. Hosp. at Syosset*, 204 A.D.3d 858, 860, 166 N.Y.S.3d 676, 679 (2d Dept 2022)), plaintiff failed to raise a triable issue of fact with regard to the second cause of action alleging the failure to obtain informed consent. To establish a cause of action to recover damages based on lack of informed consent, a plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury. *Gilmore v. Mihail*, 174 A.D.3d 686, 688, 105 N.Y.S.3d 504 (2d Dept 2019). "The third element is construed to mean that the actual procedure performed for which there was no informed consent must have been a proximate cause of the injury" (*id.* at 688 [internal quotation marks omitted]).

[* 10]

The fact that Ms. Clairvil signed a consent form alone does not establish a defendant's prima facie entitlement to judgment as a matter of law. *Guinn v. New York Methodist Hosp.*, 212 A.D.3d 787, 789, 183 N.Y.S.3d 431, 435 (2d Dept.2023). However, plaintiff failed to establish, prima facie, that Ms. Clairvil was not advised of the alternatives to surgery and the risks of proceeding with the surgery. The consent form was detailed and contained acknowledgement of various risks to the surgery. While the possibility of blood clots was already preprinted in the form that Ms. Clairvil signed, there is no basis to posit that she had not read it or that the testimony of doctors that they discussed the risks with her should be disregarded.

Defendants made a prima facie showing of informed consent by submitting testimony and medical records establishing that Ms. Clairvil was informed of the reasonably foreseeable risks associated with the procedure and that she signed a written consent forms indicating her understanding of those risks (*see* Public Health Law § 2805–d[1]). In opposition, plaintiff failed to show that a reasonably prudent person would not have undergone the surgery if apprised of those risks (*see* Public Health Law § 2805–d[3]). Moreover, to the extent plaintiff's lack of informed consent claim is premised on defendants' decisions not to perform a doppler test or delay the surgery, it must be dismissed as unviable. "Lack of informed consent does not apply where, as here, injuries allegedly resulted from a failure to undertake a procedure or a postponing of a procedure." *Akel v. Gerardi*, 200 A.D.3d 445, 159 N.Y.S.3d 399, 401 (2d Dept. 2021), citing *Ellis v. Eng*, 70 A.D.3d 887, 892, 895 N.Y.S.2d 462 (2d Dept. 2010); *S.W. v. Catskill Reg'l Med. Ctr.*, 211 A.D.3d 890, 180 N.Y.S.3d 561, (2d Dept. 2022).

The contentions of Brooklyn Hospital regarding vicarious liability, and of Dr. Ayala-Rodriguez, that she is not liable for the negligence alleged by plaintiff inasmuch as she was being supervised by another physician, are without merit. *Khutoryanskaya v. Laser & Microsurgery, P.C.*, __ A.D.3d __, 2023 WL 8440797, (2d Dept. 2023); *S.W. v. Catskill Reg'l Med. Ctr., supra*, 211 A.D.3d 890, 180 N.Y.S.3d 561, (2d Dept. 2022).

[* 11]

The Court considered the parties' remaining contentions and found them unavailing. All relief not expressly granted is denied.

Accordingly, it is

**ORDERED** that the defendants' motions for summary judgment are granted as to the second cause of action for lack of informed consent, and the second cause of action is dismissed, and it is further

**ORDERED** that defendants' motions for summary judgment in all other respects denied, and it is further,

**ORDERED** that plaintiff's counsel is directed to electronically serve a copy of this decision/order with notice of entry on the other parties' respective counsel and to electronically file an affidavit of service thereof with the Kings County Clerk, and it is further

**ORDERED** that the parties are directed to appear for an Alternative Dispute Resolution conference on February 22, 2024, at 11:30AM.

The foregoing constitutes the decision and order of this Court.

ENTER

J.S.C.

**HON. GENINE D. EDWARDS**

[* 12]